IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CASE NOS.: 1:18-CR-47-RJC
1:18-CR-68-RJC
1:18-CR-88-RJC

| |
|---|
| UNITED STATES OF AMERICA |
| |
| v. |
| |
| WANDA SKILLINGTON GREENE |

## DEFENDANT'S SENTENCING MEMORANDUM

Wanda Greene comes before the Court for sentencing having pled guilty to Federal Program Fraud, Making a False Federal Tax Return, and Receipt of Bribes and Kickbacks, in violation of, respectively, 26 U.S.C. § 7206 (1), 18 U.S.C. §§ 666 (a) (1) (A) and 2, and 18 U.S.C. §§ 666 (a) (1) (B) and 2.  Wanda has taken full responsibility for her conduct, cooperated in the government's investigation into public corruption in Buncombe County, and otherwise complied with all material terms of her plea agreement with the government. Through counsel, she submits this memorandum to assist the Court in fashioning an appropriate sentence pursuant to 18 U.S.C. § 3553 (a).

Consistent with the terms of the plea agreement, the Presentence Report ("PSR") has determined the advisory Guideline range is 70-87 months.  As the Court is well aware, however, the advisory Guideline range is but one factor to be considered

1

in determining a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing. See *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553 (a)). The defense submits that after all of the relevant statutory factors are taken into consideration, a sentence below the advisory guideline range is appropriate. Specifically, for the reasons set forth in this memorandum, we respectfully request that this Court impose a sentence of 48 months incarceration in the Bureau of Prisons.

## INTRODUCTORY STATEMENT

In May of 2017, Wanda announced her retirement as Buncombe County manager after serving in the position for 20 years. The recognition that her successor would have big shoes to fill was immediate. Asheville city manager Gary Jackson said he was "in awe" of what Wanda had accomplished in her career.[1] Brownie Newman, the Buncombe Board of Commissioners chairman, wrote to his fellow commissioners that the county was "blessed" to have had Wanda and called her "one of the most outstanding county managers in our state and country."[2] Accolades of this nature were not unusual for Wanda. Two years before, the previous chairman of the Board of Commissioners, David Gantt, used nearly identical language when he said that she was the best county manager in the United States.[3] Wanda had served, in

---

[1] https://www.citizen-times.com/story/news/local/2017/05/30/wanda-greene-retire-buncombe-manager/355372001/
[2] *Id.*
[3] Exhibit A

2

the words of one journalist, as "the voice behind Buncombe County politics, quietly steering the ship through nearly two decades of tumultuous changes."[4]

Wanda has since fallen from grace in dramatic fashion. It states the obvious to observe that the offenses to which she has pleaded guilty are serious. Wanda is a paradox. She was a dedicated public servant who was instrumental in building the infrastructure that Buncombe County needed to grow and flourish into one of North Carolina's most populous and prosperous counties,[5] yet she stole from Buncombe County and committed other serious crimes to which she has pled guilty. As John Ellis, the former director of Asheville's Diana Wortham Theatre puts it, "like many I am trying to reconcile the Wanda Greene I know and worked with, and the Wanda we read about in the newspapers."[6]

It will likely come as no surprise to the Court that even before Wanda serves the first day of the sentence this Court will impose, she will already have been devastated personally, professionally, and financially. The charges and associated publicity have brought unflagging, negative media coverage and vilification. As just one example, a Google search of her name yields phrases such as "an insult and a disgrace."[7] Wanda is held up in social media as the embodiment of wrongdoing by

---

[4] Exhibit B

[5] According to the North Carolina Department of Commerce, Buncombe County is classified as "Tier 3," which is the least economically distressed of the three tiers. It is now the seventh most populous county in North Carolina. See, https://carolinapublicpress.org/27553/state-economic-tier-rankings-leave-wnc-counties-unchanged/; https://www.northcarolina-demographics.com/counties_by_population.

[6] Exhibit C

[7] https://www.citizen-times.com/story/news/local/2017/10/07/buncombe-county-manager-wanda-greenes-bonuses-early-retirement/740752001/

3

people she has never met.   Several of her former friends have turned their backs; others remain supportive but are afraid to go near her.  As one might expect in this circumstance, the best that Wanda can do is to put one foot in front of the other.  After a long and successful career, the next thing she is facing is incarceration.

The citizens of Western North Carolina now know a great deal about Wanda's offenses.  But the extent of her contributions to Buncombe County, and the real difference those contributions have made to the well-being of the citizens of Buncombe County, are not widely known.  Wanda is much more than the sum of her transgressions. This memorandum provides first-hand accounts of other people's experiences with Wanda spanning decades and reveals important information about the story of her personal and professional life that this Court should consider.  In addition, this memorandum lays out Wanda's assistance in completed and ongoing investigations, which is likewise relevant to the Court's decision on an appropriate sentence.

## ARGUMENT

Sentencing a criminal defendant is one of the trial court's most important yet difficult tasks. Determining the appropriate sentence "requires a court to consider with great care and sensitivity, a large complex of facts, and factors." *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).   The Supreme Court has stated that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique

study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

Under 18 U.S.C. § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in the second paragraph of the statute. See *United States v. Shortt*, 485 F.3d 243, 248 (4th Cir. 2007). In undertaking its analysis, the Court must give consideration to the advisory sentencing range recommended by the Guidelines and any relevant Guideline policy statements, as well as other traditional sentencing factors, such as:

> (1) the nature of the offense and history and characteristics of the defendant;
> (2) the purpose of sentencing;
> (3) the kinds of sentences available;
> (4) the Sentencing Guidelines;
> (5) pertinent policy statements issued by the Sentencing Commission;
> (6) the need to avoid unwarranted disparities among similar offenders; and
> (7) the need to provide restitution to victims.

See 18 U.S.C. § 3553(a).

Nearly twenty-five years after the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), it is now "emphatically clear" that the "Guidelines are guidelines – that is, they are truly advisory." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). The Guidelines are no longer "the only consideration" at sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). Rather, the Guidelines merely provide a "starting point" for the Court's sentencing consideration. *Id.*; accord *Cunningham v. California*, 549 U.S. 270 (2007). While a sentencing court must consider the Guidelines as a starting point, a court should not presume "that the

5

Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Instead the Court is to impose sentence after "mak[ing] an individualized assessment based on the facts presented" in each particular case. *Id*. Moreover, the Court need not find "extraordinary circumstances to justify a sentence outside of the Guidelines range." *Id*. at 47.

As one district court judge has put it, the Guidelines' "most fundamental flaw is the notion that the complexity of human character and conduct can be rationally reduced to some arithmetic formula."[8] This is especially true in white collar cases such as this case, where the sentencing range is largely determined by escalating loss enhancements pursuant to USSG §§ 2B1.1 (in this case, 16 levels for federal program fraud and 8 levels for receipt of bribes and kickbacks), an increasingly criticized approach that can result in excessive advisory Guidelines. *See*, *e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (describing "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense."); see also *United States v. Parris*, 573 F. Supp. 2d 745, 754 (E.D.N.Y. 2008) (noting that despite the fact that the Guidelines "reflect Congress' judgment as to the appropriate national policy for such crimes . . . this does not mean that the Sentencing Guidelines for white-collar crimes should be a black stain on common sense." ).

Here, application of the § 3553(a) factors leads to the conclusion that a below guidelines sentence is appropriate. The factors addressed below, both individually and

---

[8] Terry Carter, *Rakoff's stance on the SEC draws fire, praise- - and change. The Judge Who Said No*. ABA Journal, Oct. 2013, at 53.

in combination, illustrate why a lesser sentence than the guidelines call for is a punishment "sufficient, but not greater than necessary, to accomplish the sentencing goals advanced." *Kimbrough*, 552 U.S. at 111.

## I. The Nature of the Offense and the History and Characteristics of the Defendant

### A. The nature of the offense

Wanda stands by her plea; she acknowledges her guilt, and nothing in this memorandum is intended to diminish the wrongfulness of what she did. The Factual Basis accurately describes the offense conduct involved here. Wanda freely acknowledges what she did as well as the illegality of her conduct.

### B. History and characteristics

#### 1. Early personal life

Wanda was born in Waynesville in 1951.[9] As her sister Irene Wolfe succinctly puts it, "we came from a very humble beginning."[10] Wanda's ex-husband Gene Greene, to whom she was married for 41 years, elaborates on some of the obstacles Wanda had to overcome early in life:

> Wanda, the oldest, and her four sisters had a most difficult and very financially poor life, at best. Their mother worked, but that was not the case of their father, who was alcoholic and emotionally and psychologically absent from the home, and very often physically absent for long periods. Wanda began working outside the home at age 14 to help support the family as best she could. During her high school years, she earned good grades in school while both working and helping take

---

[9] PSR ¶86
[10] Exhibit D

7

care of her sisters.

Unable to afford college after high school graduation, she married me, an enlisted member of the Navy. Financially, life was difficult for a young military family in the early 1970s, especially with me receiving orders to serve on an aircraft carrier heavily involved in the Vietnam war. Our son Michael was born while I was off the Vietnamese coast, in fact. After I returned, we settled into life together, moving to the San Diego area.

Wanda was a Navy wife and mother for many years. The family was uprooted every time Gene received his transfer orders. Wanda nonetheless persevered to get a bachelor of arts and then a masters in accounting, and finally, a PhD in business administration. As Gene explains:

I was stationed at the Naval & Marine Corps Reserve Center in Raleigh NC in 1972, and Wanda began working full-time to help support us. In addition, she began attending N.C. State University during her non-working hours, pursuing a bachelor's degree in accounting. As a military person, I was transferred several times during my career.

At each of my duty stations, Wanda worked full-time, and she continued her educational studies. She earned a Bachelor of Accounting degree from the University of Minnesota-Duluth in 1985. She earned a Bachelor of Accounting degree from California State University-Northridge in 1990, then earned her Doctor of Philosophy degree in Business Administration from Kennedy-Western University in 2005. She earned all these degrees while working full-time in increasingly complex and time-consuming positions, and while being an exemplary mother.[11]

### 2. Professional life

Wanda was hired as assistant Buncombe County Manager in May, 1994. Three years later, she was appointed as the County Manager. [12]

---

[11] Exhibit E

[12] The job of the typical county manager in North Carolina has been described as the "eyes, ears, and legs" of the board of commissioners. Managers gather facts, do research, receive information, and communicate the board's views to the public in

8

Throughout the next two decades, Wanda worked hard and excelled beyond all expectations. As Gene recalls, "I cannot even begin to recount the nights when she worked at home well into the wee hours of the morning, and most mornings she was up and gone to work well before daylight, returning long after the majority of her fellow employees had gone home."[13] Years later, she would show the same work ethic even as she battled cancer. Carol Keleher writes, "[e]ven through her recent battle with breast cancer and lymphoma, she maintained her dedication. I also recall a year or so ago, when I contacted her and her voice was obviously in pain. I asked what had happened and she told me she'd fallen down the steps at the county building. Of course, I suggested that she go home but, once again, she followed her commitment to her job."[14]

Some individuals- - including non-parties who have sent unsolicited letters to this Court- - have seized on this sentencing hearing as an opportunity to disparage Wanda's job performance, not to mention her relationships with county employees and members of the community. These criticisms cannot be squared with the evaluations contained in her personnel file, in which the vast majority of her ratings are outstanding.[15] Nor can they be squared with the recollections of those who actually worked with Wanda and paint a very different picture of her. Tom Sobol, who served

---

addition to their administrative duties. The general concept is that since most county commissioners cannot devote all of their time to county affairs, counties rely on a manager to tend to the day-to-day management of the county. *Handbook For North Carolina County Commissioners*, UNC School of Government (3d ed. 2007) at 11.
[13] Exhibit E
[14] Exhibit F
[15] Exhibit G

as the chairman of the Board of Commissioners when Wanda was appointed, remembers the ways in which Wanda was accessible and committed to solving citizens' problems both large and small. He writes:

> [H]er office was always open, not only to the commissioners, but to county employees and the general public. When a citizen called me or Wanda regarding a problem, that may have seemed small for us, but Wanda instinctively knew that to that individual it was a big problem. She always took the time to help them solve the issue. That was a trait that the county was fortunate to have. That is something you don't see very often.[16]

In a similar vein, Wanda's sister Irene Wolfe recalls how Wanda helped county employees in times of crisis. She states:

> [O]n different occasions I have witnessed Wanda go above and beyond for staff members facing crisis such as a terminal illness or a life changing event. Several years ago, two long-time staff members were facing terminal cancer and both had young children. She worked with them, Human Resources and others to help these members maximize their State Retirement and receive their benefits timely. One of these, whom has since passed away, was able to pay off his mortgage to provide his wife and young children the security of remaining in their home without financial burdens. This provided him peace in a most difficult time.[17]

Memories like Irene's provide context and explain why, even now, many who worked with Wanda maintain an emotional bond in spite of the fact that their relationships have otherwise been severed. According to Randy Flack, "[s]everal times, at lunch or dinner, former county employees and others, have approached Wanda and thanked her for helping their families in trying times; or thanking her for helping getting things done for various entities when she was County Manager. Many

---

[16] Exhibit H
[17] Exhibit D

10

of them tell her that they are praying for her.  Those are the only times that I see

tears in her eyes."[18]  As John Ellis sums it up, "while many may not be willing to say

so publicly today- my belief is that most everyone in the county had the highest

respect, appreciation and admiration for Wanda and her work.  This is why so many

of us are still dealing with this difficult dichotomy."


3.  Wanda's effectiveness as Buncombe County Manager.

Wanda took a proactive and collaborative approach to her job.   Those who

worked with her, inside and outside of county government, recall the myriad ways in

which she was innovative and effective.  The following three testimonials speak to

these traits.

a.  Heath Shuler, who represented the 11th Congressional District in the
    U.S. House of Representatives from 2007 through 2013.

Ms. Greene's network with governmental and non-governmental
agencies gave me and my staff a tremendous advantage in constituent
service.  She was always available to meet with me, or any member of
our staff.  She was vital in helping us work cooperatively with Veteran's
Service, by placing the Veteran's Service Office (each county has one)
next door to ours.  Wanda arranged for our staff to work closely with
Buncombe County Department of Social Services to learn more about
serving our constituents with problems from Social Security issues to
child adoption.  When individuals, or business entities asked for help
with federal grants, Ms. Greene was there with advice on the process
applying for such funds.  If time and space permitted, I could go on and
on about the many ways she helped us navigate serving the people of
Buncombe County.

Your Honor, there was never a time that we called on Ms. Greene that
she failed to come through with excellent assistance.  Wanda Greene
helped me better serve the people of Western North Carolina and her
service was felt not only by me and my staff but also by the citizens of

---

[18] Exhibit I

Buncombe County and all of the thirteen counties that composed the 11th Congressional District.[19]

    b. Donna Clark, who is now retired after serving as the finance director for Buncombe County.

I worked with Wanda for almost fifteen years. During this time, the County grew bigger and more complex. Wanda tirelessly chartered these challenging waters with the expertise and grace of a great leader. Her work positioned Buncombe County as a leader in the state and country.

Under her leadership the County's finances were stable, the tax rate low and fund balance at a consistently strong level, resulting in an elite AAA bond rating.

It was amazing to watch Wanda navigate the County creatively through the Great Recession through partnerships with the community and focusing on what the County's focus should be without reducing service levels to citizens. As a result the County came through the economic crisis stronger and more focused on core services. Buncombe County was the model across the State for how to create community partnerships. . .

Many jobs were created as a result of Wanda's expertise and innovative management of economic development. I truly believe Wanda's strengths as a manager, was one of the reasons companies chose Buncombe County to locate their business. . .

County employees' best interest was at the center of every decision Wanda made. From a fair rate of pay for each job to benefits that allowed employees to focus on their work serving the citizens of Buncombe County. She created an environment for leaders to take risks and challenged them to do things innovatively and strive for excellence.

There are many, many positive outcomes for the County as a result of Wanda's time there. I have only mentioned the ones that still stand out to me years later.[20]

    c. Carol Keleher, who is now retired and was formerly employed as a computer sales representative.

Moving from a city of 5 million to a city of 80,000 was a slight culture

---

[19] Exhibit J
[20] Exhibit K

12

shock. I searched for someone who I could turn to with ideas, questions, or help. I found that person in Wanda Greene. I'd always heard positive comments about her. She had vision, compassion, and a desire to help. After doing some due diligence, I discovered that, under her term as Buncombe County Manager, the county had grown in prosperity and respect. The "joke" around town was "City employees that were unhappy with stagnant thinking, applied for a position at the County so they could be heard.". . . .

In 2009, I came up with an idea that I felt could help the economy of Asheville. I decided to contact Ms. Greene and see if all the positive reviews were accurate. It always impresses me when a government official takes a phone call from an unknown entity. She listened carefully to the idea, offered suggestions, and suggested a course of action (which I followed). I was very impressed with her response and we kept in contact as to the progress of the idea. . .

I have dealt with many high-ranking officials and her professionalism and commitment for the betterment of the county has always impressed me. I am happy to write this letter to better acquaint you with a person who epitomized what a good public servant should convey...a desire to help the people she serves. [21]

The fact that individuals of this stature are willing to submit letters of support for Wanda under the circumstances of this high-profile case is itself testament to just how much Wanda is respected by those who know her contributions to Buncombe County. From in-person interviews, the undersigned counsel can represent to this Court that there are a not-insignificant number of Buncombe County residents who echo these testimonials; however, they were not comfortable publicly expressing support for Wanda out of fear that they will be subjected to ridicule and derision.

---

[21] Exhibit F

4. Specific achievements that improve the well-being of Buncombe County residents.

Carol and Bruce Peterson are lifelong residents of Buncombe County who have been active in civic affairs for the majority of their lives. Their past service includes membership on the Board of Trustees for UNC-Asheville (Bruce) and service on the Buncombe County Commission from 2004-2012 (Carol). They have taken great pains to stress that they in no way condone what Wanda has done. That said, they have compiled, for this Court's information, a list of projects that were "**planned, implemented, and overseen to completion**" by Wanda during the eight years Carol served as a commissioner. That list is as follows:

## EDUCATION

- Constructed two intermediate schools; one in the Erwin District and one in the Roberson District

- Implemented a step system for the distribution of Buncombe County's supplementary pay for our public-school teachers, including the teachers at Asheville-Buncombe Technical Community College

## HEALTH/HUMAN SERVICES

- Consolidated Health and Human Services with a move to 45 Coxe Avenue which resulted in additional services to citizens at a cost savings to taxpayers. This system serves as a national model.

- Partnered with Western North Carolina Community Health Services to provide universal health care for our citizens, over 14,000 new people served.

- Instituted a program to remove over 459 dilapidated and unsafe mobile homes.

- Leveraged $100,592,927 in workforce housing by partnerships and $4,993,185 in county investment

- Converted 52% of Buncombe County's Community Transportation System,

14

Mountain Mobility vehicles to alternative fuel capabilities (gas, propane, CNG).

## SAFETY AND LAW ENFORCEMENT

- Constructed Public Safety Training Center for law enforcement, public safety, and emergency services to keep staff current at the cost of $15.7 million

- Opened new 911 emergency call center with all local municipalities in one location to coordinate efforts and expenses

- Placed school resource officers in every middle and high school

## ENVIRONMENT

- Instituted model steep slope ordinance that will protect overdevelopment of ridge tops and hillsides. This is a state model.

- Instituted Dark Skies light ordinance that will prevent light trespass and save energy

- Instituted asphalt plant standard to reduce placement and guide toward appropriate areas of the County

- Instituted retaining wall ordinance. This is a state model.

- Revised public tower ordinance to protect neighborhoods

- Adopted County-sustainability goals and objectives

- Partnered with groups to preserve over 5,000 acres of land, primarily steep slope and ridge top, prime farmland in conservation easements. Received state reorganization for innovative and effective preservation

- Conducted Greenway master plan to methodically coordinate 102 miles in greenways across the County for fitness, tourism, and recreation

- Conducted master plan for sports park and Lake Julian park

Case 1:18-cr-00088-RJC-WCM   Document 74   Filed 08/22/19   Page 15 of 30

## CONSTRUCTION

- Renovated Pack Library ($4.2 million)

- Completed College Street Parking deck ($13.1 million)

- Renovated Back Mountain Library ($322,000)

- Completed public safety training facility ($15.7 million)

- Completed animal shelter facility, adoption center, and ABT student training facility ($4.4 million)

- Renovated Woodfin Street County office building ($4.3 million)

- Renovated Coxe Avenue Health/Human Services building ($5.1 million)

- Completed Life Safety Tower that opened the top 5 floors of the Historic Courthouse; recycles the use of the 90 year old building ($30.8 million)

- Certified LEED judicial complex ($42 million)

## GOVERNMENT EFFICIENCY

- Attained AAA bond rating

- Integrated one stop permitting to help builders and developers get all necessary information and compliance paperwork in one location

- Secured $18 million in real estate at no cost to the County during the mental health transition

- Through smart partnerships, reduced County staff by 200 positions

- Reallocated funding for $5 million in conservation easements without negatively impacting the fund balance percentage

- Moved county toward paperless system to make data readily available and reduce staff time required to find records

Case 1:18-cr-00088-RJC-WCM   Document 74   Filed 08/22/19   Page 16 of 30

## APPRAISAL AND TAXATION

- Attained the 3rd highest collection rate in NC with population of 100,000 and greater (98.75%)

- Assisted 7,808 citizens with payment plans to help county residents with their property tax

## SOLID WASTE

- Opened Buncombe County landfill gas to energy project which involved the installation of gas collection wells at the landfill resulting in the capturing of methane gas which is diverted to a generator that produced 1.4 megawatts of electricity, enough to power about 1,000 homes per year

## ECONOMIC DEVELOPMENT

- Added 2301 jobs between 2009-2012

- Increased tax base (example: addition of Linamart resulted in $651 million increase)

- Lowest unemployment rate in North Carolina (September, 2012). Adopted living wage for Buncombe County employees[22]

But even this list does not convey the depth and breadth of Wanda's achievements as county manager. Pertinent examples include the following:

a. Schools

Donna Clark writes, "once known as one of the worst public school infrastructures in the nation, Wanda used school capital funds wisely and conservatively, building and renovating, what I think was every school in both the County and City systems." This is no exaggeration. Here is how Buncombe County

---

[22] Exhibit L

schools were described by the National Education Association in the mid-1980s:

## Schools Dilapidated

ASHEVILLE (AP) — Buncombe County's school system ranks ninth on the National Education Association's "Dilapidated Dozen," a list of the systems with the most run-down facilities.

The list, compiled from results of a nationwide survey, was published in the June issue of NEA Today.

Buncombe County school administrators said the quality of its education is sound but acknowledged their buildings need work. It would take $70.1 million to bring the system's schools to an acceptable standard, they say.

Most of the buildings were built in the 1920s and are antiquated and overcrowded, officials say. Every classroom is full in most buildings, and basements, closet areas and auditorium balconies have been turned into classrooms.

By 2016, Buncombe County had built 21 new schools and renovated all of its existing schools.[23]  Here is one example of a before and after picture:



---

[23] Exhibit M

b. Jobs

After announcing that he would not run for reelection to the Buncombe County Commission in the 2016 election, then-commission chair David Gantt made a presentation summarizing the county's enviable track record while he served on the commission. When he got to the topic of job creation, he told a story about Wanda saving hundreds of jobs at General Electric. The story went like this:

In 2013, General Electric wanted to expand its operations in Buncombe County but its space requirements were a challenge to meet. If GE's expansion could not be accommodated, it would have to relocate. Wanda was involved with the planning for the expansion from the beginning. The county tried to place the project in numerous areas of the county but nothing seemed to work out. The clock was ticking, and nothing was working. Then Wanda knocked on the door of GE's existing neighbor, Old Dominion Trucking, and asked if Old Dominion would consider selling its land to GE and move its entire operation. After an initial reaction that amounted to "What???" Old Dominion agreed to consider the move. At the last minute, Wanda then found a location Old Dominion would agree to, the county bought the land, and swapped with Old Dominion. Eleven months after demolition, GE stayed in Buncombe County.[24]

The end result was that GE stayed in Asheville, and 300 jobs were saved. GE has since expanded twice adding additional jobs to those that were saved. [25]

---

[24] Exhibit N
[25] https://www.ashevillechamber.org/news-events/ge-aviation-announces-asheville-expansion/

This is but one example of Wanda's role in helping to promote job creation. Others include Linamar, which announced in 2011 that it would be opening a manufacturing facility in Asheville. It has expanded several times and now employs approximately 650 residents. [26] Similarly, Wanda played a role in attracting Avadim Technologies, which added 550 new jobs in Buncombe County.

      c.  AAA bond rating.[27]

In 2012, Buncombe County became the sixth county in North Carolina to attain a AAA bond rating, the highest available. As Wanda told the Asheville Citizen-Times, "we're thrilled. There's no other way to put it."[28] Standard and Poor's assessment stated, "despite budgetary pressures attributed to the economic downturn, Buncombe's financial performance has remained very strong. Management has consistently produced general fund surpluses and maintained strong reserves above policy targets. Buncombe's financial management practices are strong, well-embedded, and likely sustainable." Other factors which led to this rating included "maintenance of strong reserves and liquidity," "strong financial management practices and policies," and "low overall debt levels."[29]

In financial terms, a county's bond rating is important because it helps the county keep interest rates relatively low. In Wanda's mind, balancing the competing interests of debt, tax rate, facility needs and service expansions required a broad-

---

[26] https://www.ashevillechamber.org/news-events/press-releases/linamar-announces-us-manufacturing-facility-in-asheville/
[27] https://www.buncombecounty.org/countycenter/news-detail.aspx?id=12425
[28] Exhibit O
[29] https://www.buncombecounty.org/countycenter/news-detail.aspx?id=12425

based focus, long-term planning and solid financial management.

In simpler terms, if Buncombe County was compared to a house with a mortgage, here is how much equity the county had:

With such a high equity to debt ratio, Buncombe County has been able to do things that benefit all of its citizens such as construct a new animal shelter,[30] library,[31] and new training facility for law enforcement.[32]

### 5. Age and health concerns

In September 2015, Wanda was diagnosed with breast cancer. In 2016, she had a double mastectomy.[33] In April 2017, Wanda was diagnosed with lymphoproliferative disorder. She underwent weekly chemotherapy for six months as well as 15 radiation treatments.[34] She has had a recent recurrence and is currently undergoing radiation, which takes its toll. Randy Flack attests, "I have taken her to doctor's appointments for treatments for her cancer. Although she is, sometimes, very weak from the treatments, she remains very strong and always maintains a positive attitude." ." *See*, *United States v. Beck*, 2019 WL 2716505 (M.D.N.C. June 28, 2019) ("[B]reast cancer is a life-threatening illness even after tumors are removed . . .").

Section 3553(a) recognizes that the Court should take into account any medical issues facing the defendant and whether the sentence imposed will "provide the defendant . . . with needed medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). The advisory Guidelines likewise provide that:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender

---

[30] Exhibit P
[31] Exhibit Q
[32] Exhibit R
[33] PSR ¶90.
[34] PSR ¶90.

characteristics, is present to an unusual degree and distinguishes the cases from the typical cases covered by the Guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

USSG §5H1.4.

Although the undersigned counsel are not asking for a non-custodial sentence, it bears mention that Courts can and do impose non-custodial sentences in cases involving defendants who suffer from serious medical conditions. For example, following the defendant's conviction after trial for wire fraud in *United States v. Burks*, 2010 WL 1221752 (E.D.N.Y. Mar. 29, 2010), the sentencing court imposed a sentence of one month incarceration and five years' probation despite a Guidelines range of 57-71 months where, *inter alia*, the defendant suffered from degenerative diabetes. *Id*. at *2; *United States v. Alatsas*, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (imposing a term of probation, despite Guidelines range of 24-30 months where, *inter alia*,"[d]efendant has multiple complex medical problems, which will be better cared for outside of prison.").

### C. The Nature and Extent of Wanda's Cooperation

Wanda has committed to cooperating with the government to the best of her ability. Over the course of more than a year, she has participated in five debriefings with federal and state investigators who are tasked with investigating public corruption and related matters in Buncombe County. Each debriefing has lasted for hours. The subjects of discussion have been wide-ranging. They run the spectrum from early retirement incentives to falsified invoices, and include at least a dozen

23

other areas of inquiry. The undersigned counsel believe that Wanda's expertise in the workings of county government has been of particular use to investigators. The picture below is from one debriefing in which she had to explain an unusually complex set of facts:



Of particular significance is the information Wanda provided concerning the investment of Buncombe County money in the Tryon International Equestrian Center and the involvement of former Commissioner Ellen Frost, who has since been indicted

as a result. Here Wanda provided detailed information regarding conversations and meetings that was of significant value. As a result, the case captioned *United States v. Frost* is now pending in this Court in Case Number 1:19-CR-64-RJC-DSC. If the former commissioner elects to proceed to trial, Wanda is prepared to testify for the government.

There is more. To maximize her effort to make amends, Wanda has enlisted the help of retired FBI agent Brian Cid. Brian has worked with Wanda to ensure that she provides any potentially relevant facts and no stone goes unturned. As part of this effort, Wanda has worked proactively using a recording device to further a pending grand jury investigation in which she is not a co-conspirator, but a victim.[35]

Codefendant Jon Creighton has submitted to this Court a memorandum setting forth his view of his own cooperation. Portions of this memorandum merit comment only because it contains assertions that should have no bearing on Wanda's sentence. Mr. Creighton's memorandum attempts to paint a picture in which Wanda, who was both "powerful" and "mercurial," provided him with a "wish list" of places she wanted to go, and which he later provided to investigators as a "smoking gun document." (Case No. 1:18-CR-88, Doc. No. 67 at 3, 31).

To be clear, Wanda accepts full responsibility as well. And like Mr. Creighton, she owned up to the arrangement before the government told her that it was aware of the misconduct. At the same time, Mr. Creighton's characterizations require

---

[35] Further details are omitted because there is a pending grand jury investigation. Because of this, the defense will wait until after the government states its position regarding Wanda's cooperation and elaborate only as necessary.

additional context.  Enlarging the touted document reveals that it is replete with references to "NACo" and "ICMA."  NACo is the National Association of Counties, and ICMA is an international association of city and county managers.  The document contains the dates and locations of professional conferences; it is not simply a list of places Wanda wanted to visit.  And to the extent there is the insinuation that Mr. Creighton was somehow acceding to Wanda's desires, Wanda and Mr. Creighton will have to agree to disagree.   The facts here are just what they look like.  The appeal of this arrangement was not the coercive influence of any person but rather, the fact that all involved liked to travel.

### D. Restitution

Wanda has paid restitution for the counts of conviction to Buncombe County in full through a civil settlement in the amount of $750,000.00. Therefore, Buncombe County is not requesting restitution.[36]

The IRS has requested restitution in the amount of $207,660.00, which is based on its calculation of challenged deductions and unreported income attributed to Wanda as a result of the offenses.  An unresolved question is how the fact that she has repaid money which comprises a portion of the unreported income affects her tax liability.  Wanda has retained the Charlotte law firm of Culp Elliott & Carpenter, whose lawyers specialize in tax law, to assist her in answering this question.  Based on this, the parties have agreed to jointly request that the Court defer determination

---

[36] PSR ¶116

Case 1:18-cr-00088-RJC-WCM   Document 74   Filed 08/22/19   Page 26 of 30

of restitution until 90 days after sentencing. After Wanda's tax liability is finalized, she intends to pay this as well.

### E. Collateral consequences

Wanda has entered into a consent order revoking her license as a CPA.[37] Although the PSR does not list the exact amount of reduction, it is a certainty that her state retirement benefits will be substantially reduced as a result of her convictions.[38] And most recently, notwithstanding her status as a cooperating witness against former commissioner Frost, Buncombe County has announced its attention to sue her for money paid in connection with the Tryon International Equestrian Center.

### F. The Purpose of Sentencing

Each sentence imposed under the Guidelines should be determined based on the relevant facts and circumstances, and designed:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

18 U.S.C. § 3553(a)(2).

These factors do not warrant the period of incarceration that the Guidelines call for. With respect to specific deterrence, there is scant risk of recidivism in Wanda's

---

[37] Exhibit S
[38] PSR ¶97. The anticipated reduction is $6,857 per month.

case; she has never had any prior interactions with law enforcement, other than a ticket for running a red light in 2000. She is a low risk for recidivism not only because she no longer works for Buncombe County, but also in light of her age. *See*, *e.g.*, *United States v. Smith*, 275 F. App'x 184, 187 (4th Cir. 2008) (affirming 54 months downward variance in part because of low risk of recidivism). Statistical data from a study commissioned by the United States Sentencing Commission show that "[r]ecidivism rates decline relatively consistently as age increases." U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12.[39] That study indicates that a defendant over the age of 50 in criminal history category I has a 6.2 percent likelihood of recidivating.[40] Based on the government's research, then, the likelihood of recidivism for a 67 year-old woman such as Wanda is far less.

Beyond her age, a number of other characteristics make recidivism by Wanda highly unlikely, including her level of education and lack of illicit drug use. Indeed, elderly white-collar offenders generally are considered low risk by the Bureau of Prisons and pose very little risk of reoffending.[41]

Regarding general deterrence, if this Court imposes a sentence of 48 months, it is doubtful that any public servant contemplating breaking the law could look at what has happened and will happen to Wanda- - her public vilification, hundreds of thousands of dollars in restitution, the termination of innumerable personal and

---

[39] Available at: (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/researchpublications/ 2004/200405 Recidivism Criminal History.pdf).
[40] *Id*. at Ex. 9.
[41] *Id*.

professional relationships, the prosecution of her own son, the imminent loss of her

freedom and everything she holds dear- - and not conclude that is a path to be

avoided.

## CONCLUSION

Wanda is feeling the significance and weight of her mistakes and will continue

to do so for the rest of her life.  In light of the facts and circumstances of this case as

presented here, the undersigned counsel respectfully submit that the sentencing goals

listed in § 3553(a) are satisfied by a sentence of 48 months.

Dated: August 22, 2019

Respectfully submitted,

/s/ Noell Tin
Noell P. Tin
TIN FULTON WALKER & OWEN PLLC
301 East Park Avenue
Charlotte, NC 28203
T: 704-338-1220
F: 704-338-1312
ntin@tinfulton.com

/s/ Thomas Amburgey

AMBURGEY LAW P.A.
22 South Pack Square #1200
Asheville, N.C.  28801
T: (828) 989-3210
F: (828) 610-5521
thomas@ashevilledefense.com

COUNSEL FOR WANDA GREENE

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has served the foregoing
DEFENDANT'S SENTENCING MEMORANDUM with the Clerk of Court using the
CM/ECF system, which will send notification of such filing to opposing counsel:

> Richard Edwards
> Assistant U.S. Attorney
> richard.edwards2@usdoj.gov

Dated: August 22, 2019

/s/ Noell P. Tin